UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------X
                                        :
In re:                                  :        Chapter 11
                                        :
R SHIMON BAR YOKHAI CAB CORP., a        :
New York corporation,                   :        Case No.
                                        :
                    Debtor.             :
                                        X
--------------------------------------------------------

## FIRST DAY AFFIDAVIT OF OFFER HARARI
## PURSUANT TO RULE 1007-4 OF THE LOCAL BANKRUPTCY
## RULES FOR THE EASTERN DISTRICT OF NEW YORK

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NEW YORK         )

Offer Harari, being duly sworn, deposes and says:

1.    I am the President of the Debtor, a privately-held corporation organized under the laws of the state of New York, and Debtor-in-possession in the above-captioned chapter 11 case. The Debtor is the owner of 20 New York City taxicab medallions. The Debtor is not a small business debtor within the meaning of Bankruptcy Code § 101(51D).

2.    In my capacity as President of the Debtor, I am familiar with its day-to-day operations, business and financial affairs, and I have hands-on management responsibility with respect to those affairs.

3.    My daughters, Joelle Harari and Kareene Harari, and my wife, Paula Bouzaglou, are shareholders of the Debtor. I bear the significant responsibility for the operation of the Debtor.

4.    I have extensive experience in the taxicab business, having owned or managed New York City taxicab medallions for over 35 years.

1

4253375

5.    On July 26, 2019, the following nine entities, owning two medallions each, merged into the Debtor:

    i.     H EP KJVAI Cab Corp., a New York corporation,

    ii.     Rishon Lezion FFMIDS Cab Corp., a New York corporation,

    iii.     Ashamal Cab Corp., a New York corporation,

    iv.     Red Sea Dead Sea Cab Corp., a New York corporation,

    v.     HPO Harav Kook 35 Cab Corp., a New York corporation,

    vi.     ZFat Tiberias Jerusalem Cab Corp., a New York corporation,

    vii.     Tel Chai Trumpeldor Cab Corp., a New York corporation,

    viii.     Sienna Rain Cab Corp., a New York corporation, and

    ix.     Hakotel the Wailing Wall Cab Corp., a New York corporation.

Insofar as the Debtor previously owned two medallions, the surviving merged entity owns 20 medallions.  Each and every obligation of the each above entity as it existed pre-merger, is affirmed by the Debtor.

6.    Except as indicated, all facts set forth in this Affidavit are based upon: (i) my personal knowledge; (ii) information supplied to me by others within the Debtor's organization and professionals retained to provide advice; (iii) my review of relevant documents as well as publicly available information cited herein; and (iv) my opinion based upon my experience and knowledge with respect to the Debtor's operations and financial condition, and with respect to the industry.  I am authorized to submit this affidavit (the "Affidavit") on behalf of the Debtor, and if called upon to testify, I would testify competently to the facts set forth herein.

7.    I submit this Affidavit pursuant to Rule 1007-4 of the Local Rules for the United States Bankruptcy Court for the Eastern District of New York (the "Local Rules") in support of

4253375

the Debtor's petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), filed July 29, 2019 (the "Petition Date").  I have reviewed the Debtor's petition, and it is true and accurate to the best of my knowledge, and the relief sought therein is essential to ensure the continued operation of the Debtor's business and the preservation of contractual arrangements and jobs, while the Debtor seeks to reorganize under chapter 11 of the Bankruptcy Code.

8.      There is no other or prior bankruptcy case filed by or against the Debtor.

9.      A copy of the board resolution authorizing the Chapter 11 filing is attached to the petition and incorporated by reference herein.

## I.  The Debtor's Business

### a.  The Debtor's Business Operations

10.      The Debtor is in the business of leasing taxicab medallions and its primary assets are 20 medallions (the "Medallions") issued by the New York City Taxi and Limousine Commission ("TLC"), namely, Medallion Numbers:

|       |       |
| ----: | ----- |
| i.    | 1R70  |
| ii.   | 1R71  |
| iii.  | 2R12  |
| iv.   | 2R13  |
| v.    | 1R68  |
| vi.   | 1R69  |
| vii.  | 2R18  |
| viii. | 2R19  |
| ix.   | 1R62  |
| x.    | 1R63  |
| xi.   | 2R14  |
| xii.  | 2R15  |
| xiii. | 2R16  |
| xiv.  | 2R17  |
| xv.   | 1R64  |
| xvi.  | 1R65  |
| xvii. | 1R66  |
| xviii.| 1R67  |

3

xix.    2R20
xx.    2R21

11.    These Medallions permit the Debtor or its licensees/managers to perform taxi services.

12.    The Debtor's Medallions are leased from the Debtor by Queens Medallion Leasing, a non-debtor management company (the "Management Company"). The Management Company leases the Medallions directly from the Debtor and operates them using vehicles that are owned by the Management Company. Today, the Management Company's monthly base lease obligation to the Debtor is $700 per Medallion, or a total of $11,200 per month.[1] The Management Company subleases the medallioned taxi vehicles to licensed taxi drivers and receives the gross revenues from the operation of the taxi vehicles. The Management Company then pays therefrom all expenses associated with the utilization of the Medallions and operation of the taxis, including insurance coverage, taxes, vehicle maintenance and repairs. Historically, it also paid its monthly base lease obligations directly to the Debtor's lender, Melrose Credit Union, to be applied to the Debtor's historical obligations.

13.    As a result of the foregoing, the Debtor did not maintain its own bank accounts prepetition. All receipts and all disbursements with respect to the operations of the Medallions are made by the Management Company. The Management Company is not affiliated with the Debtor. Upon information and belief, in addition to managing the Debtor's Medallions and the taxicabs, it also manages medallions, taxicabs, cash receipts and disbursements for other non-debtor companies which own and lease taxi medallions and taxis.

---

[1] $700/month X 16 medallions = $11,200/month. Four of the twenty medallions were voluntarily put into storage prepetition, and are currently being held by the TLC, insofar as they are wheelchair accessible medallions and there are no vehicles available to operate said medallions. Additionally, just last week, two additional medallions were improperly repossessed by Melrose Credit Union or its agents. Contemporaneously with this filing, the Debtor has demanded immediate turnover under 11 U.S.C. Section 542 in order to immediately return those two medallions to service so that the Debtor can continue to collect $11,200 per month.

14.     The business and corporate structure described above pursuant to which the Debtor, as a holding company, leases its Medallions to a management company, who in turn operates those Medallions by subleasing them to individual drivers, is typical in the taxicab industry. This is the structure pursuant to which virtually the entire New York City commercial taxicab industry has operated for many, many years. Pursuant to this structure, a financier of a medallion has no relationship, or said more formally, no privity with the management company or the driver. Although it is the revenues generated through the management company that pay the financier, the lender has no right to pursue the management company for payment of the Debtor's obligations. Conversely, this also means that a taxicab management company is not the party in interest with the legal right to defend against, or stop, via a Chapter 11 filing, a lender's foreclosure against a debtor's medallions, without which the management company's business, like the Debtor's, will also cease.

15.     Foreclosure by a lender will have a ripple effect all the way down the supply chain, affecting many individuals, many creditors, and many jobs. For example, Melrose Credit Union's self-help repossession of two Medallions owned by the Debtor, which occurred last week, on July 22, will, if not reversed immediately, result in: (i) the Debtor's loss of these assets; (ii) the Management Company loss of its rights and lessee, which is its ability to operate taxicabs round the clock; (iii) three shifts of taxicab drivers operating 7 days per week, lose their jobs driving the cabs associated with the Debtor's medallions which are managed by Queens Medallion; and (iv) Melrose Credit Union benefitting from what is currently being referred to by federal and state authorities as at worse, a criminal enterprise (more on that below), and at best, a key driver of the entire taxi industry crisis.

16.     By virtue of this Chapter 11 filing, and by seeking to reorganize under Chapter 11,

the Debtor seeks to avoid this result and specifically, to recover the two medallions previously repossessed, and to prevent repossession of the Debtor's other 18 medallions.

      b.  Reason for the Chapter 11 Filing

          *i. Melrose Credit Union*

17.     On July 22, and in breach of the peace, while taxi drivers were actually operating their cabs and attempting to earn a living, the National Credit Union Administration ("NCUA") the conservator/liquidator of lender Melrose Credit Union ("Melrose"), used "self-help" remedies to repossess two of the Debtor's medallions, numbers 1R71 and 2R17 (the "Repossessed Medallions"). This occurred notwithstanding pending litigation between Melrose and the Debtor wherein Melrose was seeking replevin, and wherein the court, in the case of one of the medallions, denied Melrose replevin of the Repossessed Medallions. I am told that there was at least a verbal altercation between the taxi driver who were attempting to make a living, and Melrose's agent, when this repossession occurred on July 22. I am also advised that Melrose's agent initially denied that it had used self-help on behalf of Melrose, and instead advised the Management Company that these two medallions must have been stolen by someone else. I do not know where the two Melrose Repossessed Medallions are today.

18.     Melrose has recently been singled out by regulators, the TLC and investigators as a key contributor to the taxicab medallion bubble. It has been singled out for predatory lending practices surrounding taxi medallion loans. As described in a recent report issued by the United States Office of the Inspector General, Melrose's former president Alan Kaufman has been arrested and charged with bribery in federal court.

19.     The March 29, 2019 report from the National Credit Union Administration's Office of Inspector General found that Melrose engaged in systemic unsafe and unsound lending

practices when the loans were issued to the Debtor.  The OIG report details how Melrose issued loans for the purchase of taxi cab medallions without adequately considering borrowers' repayment ability - simply to prop up the unrealistic value bubble it had helped to create.  When the medallions which served as security for the loans were "worth" $1 million or more in the market, Melrose could profit by charging interest and, in the case of a default, simply repossess and auction the medallions to recoup the sums lent.  This model, while profitable at first, collapsed when medallion values plummeted after electronic hailing services such as Uber and Lyft penetrated the market (more on this below).  The Debtor is a victim (along with many others) of this predatory asset-based lending model.

20.    As stated in the OIG Report, Melrose engaged in these persistent predatory lending practices despite repeated warnings from regulators, and refused to collect and review critical financial information from borrowers to verify that they could financially meet the medallion loan debt service requirements.  The OIG Report details how the NCUA issued Documents of Resolution ("DORs") to Melrose identifying its unsound underwriting practices for taxi cab medallion loans and demanding that corrective actions be taken beginning in 2014. Melrose never heeded the NCUA's warnings or demands.  The OIG Report cites these specific failures:

- "Underwriting and monitoring of taxi medallion loans did not include analysis of the borrower's ability to repay the loan documented by the review of borrower financial statements or tax returns. Although regulators documented findings and encouraged verification of borrower cash flow, the Credit Unions often refused to do so."

- "In all cases, [NCUA] examiners indicated current credit memoranda for taxi medallion loans did not provide enough detail to allow the approving loan officer to make a fully informed lending decision."

7

- In 2013, when medallion values increased to $1 million and more, "[NCUA] Examiners were concerned that medallions were trading above their economic values and encouraged the Credit Unions to focus on borrower cash flow for underwriting. However, the Credit Unions continued to lend based on inflated valuations from recent auction sales rather than industry accepted best practices for loan underwriting such as cash flow analysis, debt service coverage, and secondary sources of repayment. This resulted in larger loans to medallion owners that were unsupported by sufficient cash flow to service the underlying debt."

21.     In a December 31, 2013 examination report, the NCUA concluded that, based on its review, Melrose's "[u]nderwriting" and "cash flow analysis" remain "deficient," and that "[t]he portfolio [of taxi medallion] loans is highly collateral-dependent – severely so.  The portfolio is highly collateral dependent on an intangible asset which has seen high levels of price escalation in recent years." This finding was made months before the loans were made to the Debtor.

22.     The OIG Report further recounts that Melrose, faced with alarm bells from regulators about escalating medallion values and unsound lending practices, "continued to base lending decisions predominately on comparable sales value [of the medallions] rather than industry accepted best practices for commercial loan underwriting."  In response to Melrose's inaction, the NCUA codified a rule, which became effective in January 2017, that "requires credit unions to fully evaluate the ability of the borrower to meet debt service requirements [for commercial loans]." While already the industry standard, the NCUA deemed it necessary to codify the rule because Melrose blatantly failed to meet this basic standard in approving thousands of taxi medallion loans.

23.     The OIG determined that Melrose's systematic policy of issuing excessive taxi medallion loans while disregarding the borrower's repayment ability, was done for one purpose - to generate profits for the credit union.  There was no concern or regard for the borrowers or how

they would be affected by a drop in medallion prices. As the OIG concluded for the three investigated credit unions, "[w]ith profitability so heavily reliant on income from one business line – taxi medallion lending – management and the Boards of Directors should have maintained the highest standards of risk management practices." The OIG concluded that instead, Melrose's Board of Directors exhibited no urgency, or take any corrective actions, in response to regulator's concerns about these unsound loans. As medallion prices rose higher, so did the amount of Melrose's loans collateralized by the medallions.

## ii. History of the Industry and the Problems it Faces

24.      During the Depression of the 1930's, thousands of drivers descended upon New York City, in the hopes of earning a living picking up fares. It was said that at one point, New York had as many as 30,000 cab drivers in a completely unregulated industry, resulting in traffic congestion and unsavory practices. Public concern arose not only over the congestion, but over the maintenance and mechanical integrity of the taxi vehicles as well as over the integrity of the drivers. In 1937, Mayor La Guardia signed the Haas Act which introduced official taxi licenses and the medallion system that remains in place today. The Haas Act resulted in the restriction of cab licenses to some 11,787, a number which held firm over a period of nearly 60 years until 1996 when the TLC began auctioning off new licenses. As of March 14, 2014, in New York City, there were some 13,605 taxicab medallion licenses in existence and 51,398 men and women licensed to drive them. Importantly, 368 of these 13,605 licenses had been auctioned by the City of New York in three separate auctions between November 2013 and March 2014 at prices averaging $1,250,000 per medallion.

25.      The TLC regulations require that owners of taxicab medallions must comply with the following rules, regulations and restrictions, to name a few:

a.   Cabs must be inspected every four months;

b.   Taxicabs must have certain equipment, including partitions, taximeters of a make and type acceptable to the TLC, and a credit card machine;

c.   Drivers must have special licenses, and submit to annual drug tests;

d.   Trip record information, including the location where each passenger is picked up, the total number of passengers, the location where each passenger is dropped off, the time each passenger is dropped off, the total trip mileage, the itemized metered fare for the trip, method of payment, the trip number, and other related information must be constantly made available to the TLC;

e.   50% of all fleets must be handicap accessible through a transitional process with respect to new vehicles placed into service;

f.   The TLC also prescribes other rules, regulations and restrictions regarding: licensing, operations (such as with respect to rates and tolls, EZ Pass requirements, etc.), leasing, record keeping, vehicle conditions, vehicle equipment, medallion transfers, insurance, driving hours, rates, group rides, refusing passengers, solicitation of passengers, driver's programs, etc.)..

26.   Despite these and other restrictions, medallion owners like the Debtor here paid up to $1,250,000 per medallion to the City, and lenders, like Melrose, provided *financing*, in some instances 100% financing to medallion holding companies for the purchase of these medallions. Why?  Because the City provided a monopoly to the medallion owner.  In return for paying a very large sum of money for a license to operate a taxicab, and in return for agreeing to comply with all of the costly regulations and requirements described in paragraph 25, above, a person owning a medallion company (and its financier) knew that each owned taxicab would enjoy the status of being one of a maximum of 13,605 taxicabs on the road in a City of eight million residents.

27.   In 2014, Uber entered the New York City taxicab market.  Its CEO and co-founder, Travis Kalanick had stated: "we don't have to beg for forgiveness because we are legal . . .[I]f you ask for permission upfront for something that's already legal, you'll never get it. There's no upside to them."  October 30, 2014, Politico New York.   Similarly, Erin Simpson, a

spokeswoman for Lyft, stated in July 2014 "We do not believe [New York City's] licensing and base station rules apply to the Lyft ridesharing model." *Id.*

28.     Sadly, the TLC, which had earned revenues of roughly $400 million in the Fall 2013/Winter 2014 medallion auctions, agreed.   Tens of thousands of Uber and Lyft drivers descended upon New York City (ironically reminiscent of the 1930's history described in paragraph 24 above).   No need to pay $1,000,000 or more for a license when you can do it without permission; no need to have your drivers or your cars regularly put through rigorous testing; no need to file daily ride and revenue reports with the City, and no need to make sure that your cars are environmentally friendly or handicap accessible or comply with the remaining myriad of TLC rules regulations.

29.     The result?  51,000 licensed cabbies that drive 13,600 medallion-licensed vehicles were forced to compete with tens of thousands of virtually unregulated Uber, Lyft and other similar drivers.   Crain's New York Business reported on October 6, 2015 that there were "over 30,000 Uber-affiliated vehicles in New York City today."   The TLC website itself reflects about 40,000 Uber and 10,000 Lyft vehicles on New York City Streets as of the most recently available data.  In other words, four times more Uber and Lyft vehicles alone than taxis.  This has affected the taxicab industry in two ways: (i) taxicab revenues have dropped, dramatically, and (ii) the value of the Medallions themselves, virtually all of which are financed, has similarly dropped. Why pay $1,000,000 for something, i.e., a license to pick up passengers in Manhattan that comes with all sorts of restrictions, when you can do it freely for nothing?

30.     The current value of the Medallions is based on sales, and is difficult to determine, but without question it has fallen precipitously since the February 2014 TLC auction prices. Based on some recent auction results, the value is perhaps as low as $75,000 each.

31.     As a result of all of the above, this is an industry in extremis, but an industry which, in the view of many, is valuable to the City of New York, provides hundreds of millions of safe rides per year to millions of passengers, cares about the environment and the handicapped (it is required by TLC regulation to care) and provides tens of thousands of jobs to New Yorkers.

32.     The automatic stay will give the Debtor the breathing spell it needs to normalize operations, negotiate with its creditors, and propose a plan providing for fair payments to the NCUA/Melrose based on the real value of the Medallions (Melrose's collateral) and the actual revenues that can be achieved from leasing the Medallions and Taxi Vehicles.    Absent a restructuring, other creditors of the Debtor, such as any personal injury plaintiffs injured by the operation of Debtor-licensed taxi medallions, taxing authorities, the TLC, and professionals who the Debtor owes money to, will have no recourse to the Debtor for payment of their claims.

## II.  Corporate Structure, Management and Debt Structure

### a.  Corporate Structure and Management

33.     The Debtor does not have any other officers or employees; therefore, the Debtor will not have any post-petition payroll and/or distribution obligations, other than for payment of allowed administrative expenses of the estates (including, without limitation, allowed fees and costs of professionals retained in these cases with Court approval, and United States Trustee fees).

34.     I am the person generally responsible for and familiar with the Debtor's day-to-day business operations, books and records, business affairs and general financial condition.    Each Debtor was incorporated on March 26, 2014 in Nassau County, and maintains an office at 723 Hungry Harbor Road, North Woodmere, New York, 11581.    The books and records of each Debtor are maintained there, in my custody.    The Debtors' Medallions are at the moment

12

operating throughout the city of New York, with the exception of six medallions: four that were voluntarily placed into storage with the TLC, and two that were repossessed by Melrose.

35.    The Debtor does not have any publicly held shares, debentures, or other securities.

    b.    Unsecured and Priority Claims

36.    In addition to the foregoing, the Debtor is party to a variety of pending litigation matters.

37.    The Debtor also has a modest amount of tax obligations, currently unliquidated and subject to dispute.  Some of these tax obligations are specific to the Medallion-based taxi industry, including New York City Taxicab and Hail Vehicle Trip Tax.

    c.    The Melrose Credit Union Claim

38.    In return for a loan, Zfat Tiberias Jerusalem Cab Corp executed a Note dated April 22, 2014, promising to pay Melrose the principal sum of $2,000,000 plus interest at the rate of 3.75% per annum.  The Note required the Debtor to make thirty-five monthly payments in the amount of $7,389.70 and to make a final balloon payment on April 23, 2017, the maturity date of the Note. The lender secured the Note through a Security Agreement executed April 22, 2014, which granted Melrose a security interest in NYC Taxi Medallions numbered 1R70 and 1R71, rate cards, any attached vehicles, and 200 shares of stock in Zfat Tiberias Jerusalem Cab Corp.

39.    In return for a loan, HPO Harav Kook 35 Cab Corp. executed a Note dated May 20, 2014, promising to pay Melrose the principal sum of $2,000,000 plus interest at the rate of 3.75% per annum.  The Note required the Debtor to make thirty-five monthly payments in the amount of $7,390.03 and to make a final balloon payment on May 21, 2017, the maturity date of the Note. The lender secured the Note through a Security Agreement executed May 20, 2014, which granted Melrose a security interest in NYC Taxi Medallions numbered 2R12 and 2R13,

rate cards, any attached vehicles, and 200 shares of stock in HPO Harav Kook 35 Cab Corp.

40.    In return for a loan, R Shimon Bar Yokhai Cab Corp. executed a Note dated April 22, 2014, promising to pay Melrose the principal sum of $2,000,000 plus interest at the rate of 3.75% per annum.  The Note required the Debtor to make thirty-five monthly payments in the amount of $7,389.70 and to make a final balloon payment on April 23, 2017, the maturity date of the Note. The lender secured the Note through a Security Agreement executed May 20, 2014, which granted Melrose a security interest in NYC Taxi Medallions numbered 1R68 and 1R69, rate cards, any attached vehicles, and 200 shares of stock in R Shimon Bar Yokhai Cab Corp.

41.    In return for a loan, Ashamal Cab Corp. executed a Note dated May 20, 2014, promising to pay Melrose the principal sum of $2,000,000 plus interest at the rate of 3.75% per annum.  The Note required the Debtor to make thirty-five monthly payments in the amount of $7,390.03 and to make a final balloon payment on May 20, 2017, the maturity date of the Note. The lender secured the Note through a Security Agreement executed May 20, 2014, which granted Melrose a security interest in NYC Taxi Medallions numbered 2R18 and 2R19, rate cards, any attached vehicles, and 200 shares of stock in Ashamal Cab Corp.

42.    In return for a loan, Sienna Rain Cab Corp. executed a Note dated May 24, 2014, promising to pay Melrose the principal sum of $2,000,000 plus interest at the rate of 3.75% per annum.  The Note required the Debtor to make thirty-five monthly payments in the amount of $7,389.70 and to make a final balloon payment on April 23, 2017, the maturity date of the Note. The lender secured the Note through a Security Agreement executed May 20, 2014, which granted Melrose a security interest in NYC Taxi Medallions numbered 2R18 and 2R19, rate cards, any attached vehicles, and 200 shares of stock in Sienna Rain Cab Corp.

43.    In return for a loan, Red Sea Dead Sea Cab Corp. executed a Note dated May 20,

14

2014, promising to pay Melrose the principal sum of $2,000,000 plus interest at the rate of 3.75% per annum. The Note required the Debtor to make thirty-five monthly payments in the amount of $7,390.03 and to make a final balloon payment on May 21, 2017, the maturity date of the Note. The lender secured the Note through a Security Agreement executed May 20, 2014, which granted Melrose a security interest in NYC Taxi Medallions numbered 2R14 and 2R15, rate cards, any attached vehicles, and 200 shares of stock in Red Sea Dead Sea Cab Corp.

44.     In return for a loan, Rishon Letzion FFMIDS Cab Corp. executed a Note dated May 20, 2014, promising to pay Melrose the principal sum of $2,000,000 plus interest at the rate of 3.75% per annum. The Note required the Debtor to make thirty-five monthly payments in the amount of $7,390.03 and to make a final balloon payment on May 21, 2017, the maturity date of the Note. The lender secured the Note through a Security Agreement executed May 20, 2014, which granted Melrose a security interest in NYC Taxi Medallions numbered 2R16 and 2R17, rate cards, any attached vehicles, and 200 shares of stock in Rishon Letzion FFMIDS Cab Corp.

45.     In return for a loan, Hakotel the Wailing Wall Cab Corp. executed a Note dated April 22, 2014, promising to pay Melrose the principal sum of $2,000,000 plus interest at the rate of 3.75% per annum. The Note required the Debtor to make thirty-five monthly payments in the amount of $7,389.70 and to make a final balloon payment on April 23, 2017, the maturity date of the Note. The lender secured the Note through a Security Agreement executed April 22, 2014, which granted Melrose a security interest in NYC Taxi Medallions numbered 1R64 and 1R65, rate cards, any attached vehicles, and 200 shares of stock in Hakotel the Wailing Wall Cab Corp.

46.     In return for a loan, Tel Chai Trumbeldor Cab Corp. executed a Note dated April 22, 2014, promising to pay Melrose the principal sum of $2,000,000 plus interest at the rate of 3.75% per annum. The Note required the Debtor to make thirty-five monthly payments in the

amount of $7,389.70 and to make a final balloon payment on April 23, 2017, the maturity date of the Note. The lender secured the Note through a Security Agreement executed April 22, 2014, which granted Melrose a security interest in NYC Taxi Medallions numbered 1R66 and 1R67, rate cards, any attached vehicles, and 200 shares of stock in Tel Chai Trumbeldor Cab Corp.

47.    In return for a loan, H EP KJVAI Cab Corp. executed a Note dated May 20, 2014, promising to pay Melrose the principal sum of $2,000,000 plus interest at the rate of 3.75% per annum.  The Note required the Debtor to make thirty-five monthly payments in the amount of $7,390.03 and to make a final balloon payment on May 21, 2017, the maturity date of the Note. The lender secured the Note through a Security Agreement executed May 20, 2014, which granted Melrose a security interest in NYC Taxi Medallions numbered 2R20 and 2R21, rate cards, any attached vehicles, and 200 shares of stock in H EP KJVAI Cab Corp.

48.    Melrose has alleged that the Debtor has defaulted under the aforementioned loans (the "Melrose Loans").  Melrose has filed 10 actions against the Debtor, in the following cases in New York state court:

| Index No. | Case Name |
|---|---|
| | |
| 709400/2017 | Melrose Credit Union v. Joelle Harari and Rishon Letzion FFMIDS Cab Corp. |
| | |
| 709397/2017 | Melrose Credit Union v. Joelle Harari and Ashamal Cab Corp. |
| | |
| 709395/2017 | Melrose Credit Union v. Joelle Harari and Red Sea Dead Sea Cab Corp. |

16

| | |
|---|---|
| 709389/2017 | Melrose Credit Union v. Joelle Harari and H EP KJVAI Cab Corp. |
| | |
| 708886/2017 | Melrose Credit Union v. Paula Bouzaglou and R Shimon Bar Yokhai Cab Corp. |
| | |
| 708873/2017 | Melrose Credit Union v. Paula Bouzaglou and Sienna Rain Cab Corp. |
| | |
| 708870/2017 | Melrose Credit Union v. Paula Bouzaglou and Hakotel the Wailing Wall Cab Corp. |
| | |
| 708867/2017 | Melrose Credit Union v. Paula Bouzaglou and Tel Chai Trumpeldor Cab Corp. |
| | |
| 708863/2017 | Melrose Credit Union v. Paula Bouzaglou and Zfat Tiberias Jerusalem Cab Corp. |
| | |
| 709388/2017 | Melrose Credit Union v. Kareene Harari and HPO Harav Kook 35 Cab Corp. |

49.     As of the date hereof, the total amount that Melrose claims it is owed on the Melrose Loans is approximately $20 million.  This claim amount is subject to vigorous dispute, insofar as the Debtor is in receipt of a variety of payoff notices from Melrose, stating that certain balances of the Melrose Loans are $0.

### III. Plans for this Chapter 11 Case/ Reorganization Strategy

50.     The Debtor will pursue a reorganization that will be in the best interests of all

creditors and stakeholders.

51.     The Debtor intends to continue operating its business in the ordinary course, and since most operating expenses are paid by the Management Company, the Debtor anticipates, at this time, that the only cash disbursements that will need to be made during the pendency of these cases will be for administrative expenses of the estates, including, without limitation, United States Trustee fees and estate professionals' fees, and the only cash receipts will be the monthly lease payment for the Medallions pending and subject to further order of the Court.

52.     The Debtor intends to confirm of a plan of reorganization which will, among other things, restructure the Melrose Loans to permit payment of Melrose's allowed claim in deferred installment payments over time, while also providing for payment of allowed claims of other creditors.

## IV.     Information Required by Local Rule 1007-4

53.     Pursuant to Bankruptcy Rule 1007 and Local Rule 1007-4, this Affidavit provides the following information:

54.     The Debtor is not a small business debtor within the meaning of Bankruptcy Code § 101(51D).

55.     The nature of the Debtor's business and a statement of the circumstances leading to the Debtor's filing have been described *supra*.

56.     This case was not originally commenced under chapter 7, 12 or 13.

57.     No committee was organized prior to the order for relief in this Chapter 11 case.

58.     Set forth in the attached **Exhibit A** is a list of the names and addresses and where available, telephone numbers, of the creditors holding the twenty largest unsecured claims against the Debtor, excluding insiders, and (where available) the name of the person familiar with the

18

Debtor's account.  This list also includes the amount of each claim, and, if appropriate, an indication whether such claim is contingent unliquidated, disputed, or partially secured, subject to the Debtor's rights to dispute the validity of any claims.

59.     Set forth in the attached **Exhibit B** is a list of the names and addresses of the creditors holding the five largest secured claims of the Debtor.  This list also includes the amount of each claim, a brief description and an estimate of the value of the collateral securing such claim, and, if appropriate, an indication whether such claim is subject to the Debtor's rights to dispute the validity of any claims.

60.     Set forth in the attached **Exhibit C** is a summary of the Debtor's assets and liabilities.

61.     Set forth in the attached **Exhibit D** is a list of the number and classes of debt securities of the Debtor that is publicly held.  The Debtor does not have publicly held equity securities.

62.     Set forth in the attached **Exhibit E** is a list of the Debtor's property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured or agent for any such entity.

63.     Set forth in the attached **Exhibit F** is a list of the premises owned, leased, or held under other arrangement from which the Debtor operates its business.

64.     Set forth in the attached **Exhibit G** is a list of the locations of the Debtor's substantial assets and books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

65.     Set forth in the attached **Exhibit H** is a list identifying the nature and present status of each action or proceeding, pending or threatened, against the Debtor or its property,

where a judgment against the Debtor or a seizure of it property may be imminent.

66. Set forth in the attached **Exhibit I** is a list of the names of the individuals who comprise the Debtor's existing senior management (including such management's affiliation with other non-debtor entities), their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

67. Set forth in the attached **Exhibit J** is the estimated amount of the weekly payroll to employees for the 30-day period following the filing of the Chapter 11 petition.

68. Set forth in the attached **Exhibit K** is the amount paid and proposed to be paid for services for the 30-day period following the filing of the Chapter 11 petition to officers and directors.

69. Set forth in the attached **Exhibit L** is a list of the estimated cash receipts and disbursements, net cash gain or loss, and unpaid obligations and receivables expected to accrue but remaining unpaid (other than professional fees), for the thirty-day period following the Petition Date for the Debtor.

70. Notwithstanding anything to the contrary contained in this Affidavit or any schedule attached to this Affidavit, nothing in this Affidavit or any schedule is intended to be, or should be construed as, an admission with respect to (i) the liability for, the amount of the enforceability of, or the validity of any claim, (ii) the existence, validity, enforceability or perfection of any lien, mortgage, charge, pledge or other grant of security for any claim, or (iii) the proper characterization of any transaction or financing as a sale or financing. The Debtor specifically reserves the right to challenge any claim or any transaction or any alleged security for any claim on any and all bases.

The foregoing is true and correct to the best of my knowledge and belief.

Dated:        New York, New York

      July 29, 2019

/s/

SWORN TO before me
this 29th day of July, 2019

/s/

Notary Public-State of New York
No. _____
Qualified in New York County
My Commission Expires _____

DIANA KAGAN
NOTARY PUBLIC, STATE OF NEW YORK
No. 01KA6121940
Qualified in Kings County
Commission expires 02/07/2021

**EXHIBIT A**
(20 Largest Unsecured Creditors)

See attached.

4253375

Fill in this information to identify the case:

| | |
|---|---|
| Debtor name | **R SHIMON BAR YOKHAI CAB CORP.** |
| United States Bankruptcy Court for the: | **EASTERN DISTRICT OF NEW YORK** |
| Case number (if known): | |

☐ Check if this is an

amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

**12/15**

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Melrose Credit Union** 139-30 Queens Blvd Jamaica, NY 11435 | | **Taxi Cab Medallions Nos. 1R70; 1R71; 1R66; 1R67; 1R62; 1R63; 1R68; 1R69; 1R64; 1R65; 2R12; 2R13; 2R16; 2R17; 2R20; 2R21; 2R18; 2R19; 2R14; and 2R15** | **Contingent Unliquidated Disputed** | $20,000,000.00 | $1,500,000.00 | $18,500,000.00 |
| **NYC Department of Finance** 66 John Street, Room 104 New York, NY 10038 | | **State tax warrant against Ashamal Cab Corp.** | **Contingent Unliquidated Disputed** | | | $2,959.00 |
| **NYC Department of Finance** 66 John Street, Room 104 New York, NY 10038 | | **State Tax Warrant against Red SEa Dead Sea Cab** | **Contingent Unliquidated Disputed** | | | $1,078.00 |
| **NYC Department of Finance** 66 John Street, Room 104 New York, NY 10038 | | **City Tax Lien against Red Sea Dead Sea Cab Corp.** | **Contingent Unliquidated Disputed** | | | $25.00 |
| **NYC Department of Finance** 66 John Street, Room 104 New York, NY 10038 | | **Tax Lien 3764243 (TEL CHAI TRUMPELDOR CAB CORP)** | **Contingent Unliquidated Disputed** | | | $25.00 |
| **NYC Department of Finance** 66 John Street, Room 104 New York, NY 10038 | | **Tax Lien 3764279 (HAKOTEL THE WAILING WALL CAB CORP)** | **Contingent Unliquidated Disputed** | | | $25.00 |

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com                                                                Best Case Bankruptcy

| Debtor | R SHIMON BAR YOKHAI CAB CORP. | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **NYC Department of Finance 66 John Street, Room 104 New York, NY 10038** | | **Tax Lien 3764586 (SIENNA RAIN CAB CORP)** | **Contingent Unliquidated Disputed** | | | **$25.00** |
| **NYC Department of Finance 66 John Street, Room 104 New York, NY 10038** | | **Tax lien No. 3764579 (R. SHIMON BAR YOKHAI CAB CORP)** | **Contingent Unliquidated Disputed** | | | **$25.00** |
| **NYC Department of Finance 66 John Street, Room 104 New York, NY 10038** | | **Tax lien: 3764934 (H EP KJVAI CAB CORP)** | **Contingent Unliquidated Disputed** | | | **$25.00** |
| **NYC Department of Finance 66 John Street, Room 104 New York, NY 10038** | | **Tax lien 3764725 (RISHON LETZION FFMIDS CAB CORP)** | **Contingent Unliquidated Disputed** | | | **$25.00** |
| **Eddie Guerrero 445 East 145th Street Bronx, NY 10454** | | **Litigation** | **Contingent Unliquidated Disputed** | | | **Unknown** |
| **Hyun San Lee 35-22 214th Place Bayside, NY 11361** | | **Litigation** | **Contingent Unliquidated Disputed** | | | **Unknown** |
| **Mark Woods 410 Beach 54th Street Far Rockaway, NY 11692** | | **Litigation** | **Contingent Unliquidated Disputed** | | | **Unknown** |
| **NYC Taxi & Limo Commission Attn: Commissioner Meera Joshi 33 Beaver Street New York, NY 10004** | | **Association fees** | **Contingent Unliquidated Disputed** | | | **$0.00** |

# EXHIBIT B
(5 Largest Secured Creditors)

See attached.

# EXHIBIT B

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Melrose Credit Union 139-30 Queens Blvd Jamaica, NY 11435 | | Taxi Cab Medallions Nos. 1R70; 1R71; 1R66; 1R67; 1R62; 1R63; 1R68; 1R69; 1R64; 1R65; 2R12; 2R13; 2R16; 2R17; 2R20; 2R21; 2R18; 2R19; 2R14; and 2R15 | Contingent Unliquidated Disputed | $20,000,000.00 | $1,500,000.00 | $18,500,000.00 |

## **EXHIBIT C**

(Assets and Liabilities)

**Assets**:
1. 20 Medallions
2. Vehicle and taxi equipment
3. Books and Records
4. Management Agreement with Management Company
5. Monthly payments from Management Company

**Liabilities**:
1. Melrose Credit Union Loans
2. Tax Claims
3. Litigation Claims
4. General Unsecured Creditor Claims

4253375

**EXHIBIT D**
(Publicly Held Debt & Equity Securities)

None.

4253375

## EXHIBIT E
(Property in Custody of Others)

The Repossessed Medallions are currently in the custody or control of Melrose Credit Union. There are two other medallions in the custody of the TLC.

**EXHIBIT F**
(Real Property)

None.

## EXHIBIT G
(Address of Books and Records; International Assets)


The Debtor's Medallions are operated in New York City.

The Debtor's books and records are located at 723 Hungry Harbor Road, North Woodmere, New York, 11581, and with Protax, 1679 E. 19th Street, Suite 2A, Brooklyn, NY 11229.

The Debtor has no assets held outside the territorial limits of the United States.

## EXHIBIT H

(Pending Actions With Imminent Judgments or Seizures)

| Index No. | Case Name | State |
|---|---|---|
| | | |
| | | |
| 709400/2017 | Melrose Credit Union v. Joelle Harari and Rishon Letzion FFMIDS Cab Corp. | NY |
| | | |
| 709397/2017 | Melrose Credit Union v. Joelle Harari and Ashamal Cab Corp. | NY |
| | | |
| 709395/2017 | Melrose Credit Union v. Joelle Harari and Red Sea Dead Sea Cab Corp. | NY |
| | | |
| 709389/2017 | Melrose Credit Union v. Joelle Harari and H EP KJVAI Cab Corp. | NY |
| | | |
| 708886/2017 | Melrose Credit Union v. Paula Bouzaglou and R Shimon Bar Yokhai Cab Corp. | NY |
| | | |
| 708873/2017 | Melrose Credit Union v. Paula Bouzaglou and Sienna Rain Cab Corp. | NY |
| | | |
| 708870/2017 | Melrose Credit Union v. Paula Bouzaglou and Hakotel the Wailing Wall Cab Corp. | NY |
| | | |

| 708867/2017 | Melrose Credit Union v. Paula Bouzaglou and Tel Chai Trumpeldor Cab Corp. | NY |
|---|---|---|
| | | |
| 708863/2017 | Melrose Credit Union v. Paula Bouzaglou and Zfat Tiberias Jerusalem Cab Corp. | NY |
| | | |
| 709388/2017 | Melrose Credit Union v. Kareene Harari and HPO Harav Kook 35 Cab Corp. | NY |

4253375

**EXHIBIT I**

(Senior Management)

Offer Harari has served as President of the Debtor, managing its day-to-day affairs since its inception in 2014.

Paula Bouzaglou, Joelle Harari, and Kareene Harari are shareholders and directors of the Debtor, and have also served in such capacities since 2014.

## EXHIBIT J
(Estimated Weekly Payroll for 30-Day Period After Petition Date)

None.

## EXHIBIT K
(Estimated Amounts for Officers and Directors for 30-Day Period After Petition Date)

None.

## EXHIBIT L

(30-Day Cash Flow)

Upon recovery of the Repossessed Medallions and resumption of operations, the Debtor expects to receive a net amount equal to $11,200 per month from the Management Company.

4253375